United States District Court
Southern District of Texas
ENTERED
MAR 0 9 2015
David J. Bradley, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ABEL GONZALEZ, | § § § | |
| Plaintiff, | § | |
| v. | § § | CIVIL NO. 1:14-CV-57 |
| HARLINGEN CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, | § § § § § | |
| Defendant. | | |

## MEMORANDUM OPINION AND ORDER

In this civil rights action brought under 42 U.S.C. § 1983, Abel Gonzalez (Gonzalez) brings claims against his former employer, the Harlingen Independent School District ("the District"), for violations of his First Amendment free-speech rights and his right to procedural due process guaranteed by the Fourteenth Amendment. He alleges that he followed a link in an e-mail message from the Huffington Post to its Facebook page and posted a comment containing the n-word beneath a picture of President Obama ostensibly as a proposed caption. *See* 1st Am. Compl. ¶ 6, Dkt. No. 8. The Court has before it the District's Second 12(b)(6) Motion to Dismiss for Failure to State a Claim upon which Relief can be Granted. Dkt. No. 10. That motion does not place at issue Gonzalez's First Amendment claim arising out of his termination. Upon consideration of the parties' arguments, the amended complaint, and the applicable law, the Court grants the motion in part and dismisses all of Gonzalez's claims except the First Amendment claim which the District does not challenge.

I.  BACKGROUND

Plaintiff commenced this action by filing his Original Complaint on April 7, 2014. Dkt. No. 1. The District responded with a motion to dismiss for failure to

state a claim under Federal Rule of Civil Procedure 12(b)(6) on April 29, 2014. Dkt. No. 7. Gonzalez then exercised his right to amend his complaint as a matter of course in the wake of that motion. *See* Fed. R. Civ. P. 15(a)(1) (permitting amendment of complaint as a matter of course within 21 days after a Rule 12(b) is served); 1st Am. Orig. Compl., May 19, 2014, Dkt. No. 8. Based on the amended complaint, the Court denied the District's motion to dismiss as moot. Dkt. No. 11. The District then filed the Rule 12(b)(6) motion presently before the Court challenging Gonzalez's amended complaint. Dkt. No. 10.

The Court recites the pertinent facts as alleged in Gonzalez's First Amended Original Complaint. Dkt. No. 8. As more fully detailed in Part E, these facts must be accepted as true and viewed in the light most favorable to the plaintiff for purposes of deciding the Rule 12(b)(6) motion now before the Court. *See*, e.g., *Mathews v. City of San Antonio*, No. SA: 14-cv-566-DAE, 2014 WL 7019984, at, *2 (W.D. Tex., Dec. 11, 2014); *Auriti v. Wells Fargo, N.A.*, No. 3:12-cv-334, 2013 WL 2417832, at, *2 (S.D. Tex., June 3, 2013) (Costa, J.).

### a. August 2012

In August of 2012, Gonzalez worked as a secretary at Dr. Hesiquio Rodriguez Elementary School in Harlingen, Texas ("the School"). *See* Dkt. No. 8 ¶¶ 8, 11, 40. On Saturday, August 25, 2012, Gonzalez, while at home using his personal computer, received an e-mail message from the Huffington Post website inviting him to propose a caption for a picture of President Obama by posting on its Facebook page. *Id.* ¶ 6. Gonzalez followed the link provided and posted a caption which included a racial slur. *See id.*

On August 31, 2012, C. Orlando Pettiford ("Pettiford") posted at least five times on the School's Facebook page. *See id.* ¶¶ 8, 12, 14, 17–18. He also called the School at least once. *See id.* ¶ 16. Pettiford reposted Gonzalez's proposed caption and the Huffington Post's photo accompanied by the following comment: ""Click on the above Picture...then read the COMMENT made by one of your directors!!! ABEL

2

GONZALEZ!!! Is that what you are teaching your students? Is this the RACISM that you want AMERICANS to have!!! I think he should be FIRED!!!" *Id.* ¶ 9 (alteration in original). One of Pettiford's posts time stamped 8:24 a.m. states in part "I hope that this matter is being taken seriously . . . because I think that the TV stations might find this newsworthy!!!" *Id.* ¶ 14; *see also id.* ¶ 17. After viewing this posting and Gonzalez's comment proposing a caption, *see id.* ¶ 9, Tracy Gonzalez ("T. Gonzalez"), the School's principal, called Gonzalez into her office and told him to delete his comment from the Huffington Post's Facebook page and change the privacy settings of his Facebook account "so that nobody can access it in the future." *Id.* ¶ 15. She then told Gonzalez not to discuss the incident with anyone, to "conduct [him]self in an ethical manner," and ""that if he did everything she requested, there wouldn't be any issues in the future. *Id.* Gonzalez complied by the end of the day. *See id.* ¶¶ 15, 23.

Before 10:00 a.m. that same day, Beulah Rangel ("Rangel"), the School's assistant principal, received a telephone call from B. Todd Hollis ("Hollis"). *Id.* ¶ 21. Hollis identified himself as an attorney and asked what the school intended to do about Gonzalez's comment on the Huffington Post's Facebook page. *See id.* Rangel told Hollis the District "would follow District policy to address his concerns." *Id.*

### b. Investigation, Termination, and Grievance Process

Pettiford called the School and used Facebook to contact the School on its public page and via private message on September 6 and 7, 2012, asking what had been done about his complaints and exerting administration to take action. *See id.* After Gonzalez answered the last of these calls at approximately 3:30 p.m. on September 7, 2012, he received notice that Steve Flores ("Flores"), the District's superintendent, had placed him on administrative leave with pay. *See id.* ¶ 31. The District began an investigation on September 10, 2012. *Id.* ¶ 32. After collecting answers to written questions from several witnesses including Gonzalez, *see id.* ¶¶ 34–36, T. Gonzalez issued a memorandum to Flores on September 21,

2012, in which she recommended firing Gonzalez. *Id.* ¶ 37. Flores verbally terminated Gonzalez that same day and memorialized his decision "in [a] September 25, 2012, letter." *Id.* ¶ 39.

Gonzalez filed a grievance "in an attempt to clear his name and get his job back as secretary." *Id.* ¶ 40. Four separate hearings were held, one at each level of the grievance process. *See id.* ¶¶ 44, 46, 48, 49 (hearings held Nov. 27, 2012; Jan. 15, 2013; Mar. 4, 2013; and June 11, 2013). An attorney apparently represented Gonzalez at least at the Level II and Level IV hearings. *See id.* ¶¶ 46, 49 (stating Gonzalez and his attorney were kept waiting at Level II hearing and attorney made certain requests at Level IV hearing).

The Level I hearing officer offered "to reinstate [Gonzalez] to a different position at a different location." *See id.* ¶ 45. He declined. *Id.* Gonzales alleges that the District "thereafter took the position that no 'offer' had been made to Plaintiff; that Defendant was 'reinstating' Plaintiff and that Plaintiff was directed to appear for work or face (additional) 'disciplinary action' for 'insubordination.'" *Id.* Over Gonzalez's objection, Flores presided at the Level III hearing. *Id.* ¶ 48. The District's Board heard Gonzalez's Level IV grievance on June 11, 2013. *Id.* ¶ 49. This lawsuit followed.

### c. Plaintiff's Claims

Gonzalez pleads three causes of action in his First Amended Complaint. *See id.* ¶¶ 56–71. First, he alleges that the District violated his First Amendment rights when: 1) T. Gonzalez asked him to remove the post from Facebook; (2) Flores placed him on administrative leave; and (3) Flores terminated him. *See id.* ¶¶ 58–61, 67–70. Second, Gonzalez asserts that Pettiford and Hollis conspired with the District to have him fired. *See id.* ¶¶ 62–66. Third, Gonzalez claims that his Due Process rights under the Fifth and Fourteenth Amendments were violated because he "did not receive a meaningful hearing to clear his name." *Id.* ¶ 71.

4

## II. RULE 12(b)(6) STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also*, e.g., *United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 257 (5th Cir. 2014) ("Rule 12(b)(6) does not require the [plaintiff] to present its best case or even a particularly good case, only to state a plausible case."**.**; *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010). "A claim is plausible if 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Bollinger Shipyards*, 775 F.3d at 260. The requirement that the claim be plausible on its face "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Iqbal*, 556 U.S. at 678). Put another way, "the complaint's 'factual allegations must be enough to raise a right to relief above the speculative level.'" *In re Great Lakes*, 624 F.3d at 210 (brackets omitted) (quoting *Twombly*, 550 U.S. at 555). The Supreme Court has opined that the well-worn maxim that a complaint must not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957), "has earned its retirement. It is best forgotten as an incomplete, negative gloss on an accepted pleading standard . . . ." *Twombly*, 550 U.S. at 563.

When performing a Rule 12(b)(6) analysis, all well-pleaded facts in the complaint must be accepted as true, and the complaint must be construed in the light most favorable to the plaintiff. *S.E.C. v. Cuban*, 620 F.3d 551, 553 (5th Cir. 2010); *In re Great Lakes*, 624 F.3d at 210 (citing *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)). However, "conclusory allegations, unwarranted factual inferences, [and] legal conclusions" need not be accepted as true. *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007) (quoting *Plotkin v. IP Axess Inc.*, 407 F.3d

5

690, 696 (5th Cir. 2005)); accord *Iqbal*, 556 U.S. at 662; *In re Great Lakes*, 624 F.3d at 210. Nevertheless, the plausibility standard is not a "license to look behind [a complaint's] allegations and independently assess the likelihood that the plaintiff will be able to prove them at trial." *Bollinger Shipyards*, 2014 WL 7335007 at, *4 (quoting *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 803 n. 44 (5th Cir. 2011)).

III. ANALYSIS

In 42 U.S.C. § 1983, private litigants have "a remedy for the violation [,by a person acting under color of state law,] *of rights* secured under the Constitution and laws of the United States." *Sw. Bell Tele., LP v. City of Houston*, 529 F.3d 257, 260 (5th Cir. 2008) (quoting *Kirchberg v. Feenstra*, 708 F.2d 991, 1000 (5th Cir.1983)) (emphasis in original) (stressing that Section "1983 confers no substantive rights"). "To state a section 1983 claim, 'a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.'" *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (quoting *James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir.2008)); accord. *Estate of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 1001 (5th Cir. 2014) (quoting *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012)).

In its motion to dismiss and reply, the District emphasizes what it does not challenge–it does "not argue that [Gonzalez] failed to properly plead his Free Speech and retaliation claim." Reply to M. to Dismiss 6, Dkt. No. 14. Therefore, the Court does not address that claim here. *See* 1st Am. Compl. ¶ 61. The District argues that Gonzalez has not stated a claim that: (1) he had a protected liberty or property interest in continued employment; (2) District policy was a moving force causing the other alleged First Amendment violations; and (3) the District did not agree to enter the conspiracy he alleges.

### a. Due Process Claim

The right to due process secured by the Constitution has a procedural and substantive Component; "The substantive component 'prevents the government from engaging in conduct that 'shocks the conscience' or interferes with rights 'implicit in the concept of ordered liberty,' "whereas the procedural component ensures that any government action surviving substantive due process scrutiny is 'implemented in a fair manner.'" *Hernandez v. United States*, 757 F.3d 249, 267 (5th Cir. 2014) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)). Gonzalez brings a procedural Due Process claim in his amended complaint. "To state a Fourteenth Amendment due process claim under § 1983, a plaintiff must first identify a protected life, liberty or property interest and then prove that governmental action resulted in a deprivation of that interest." *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (quoting *Baldwin v. Daniels*, 250 F.3d 943, 946 (5th Cir. 2001)). To have a property interest in continued employment, a plaintiff must "have a legitimate claim of entitlement" created and defined "by existing rules or understandings that stem from an independent source such as state law. . . ." *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)) (alteration in original).

### 1. Property Interest

To show that he had a property interest in continued employment, Gonzalez sets forth a provision from the District's 2012–13 employee handbook "address[ing] termination of non-contract employees" in his amended complaint.[1] Dkt. No. 8 ¶ 38. As described in his amended complaint, the handbook "acknowledges that '[i]t is unlawful for the district to dismiss any employee for reasons of race, color, religion, gender, national origin, age, disability, military status, genetic information, any

---

[1] Gonzalez does not argue that T. Gonzalez's alleged oral statements to him on August 31, 2012, discussed *infra*, altered his at-will employment status. *See* 1st Am. Comp. ¶ 15; *see also generally Montgomery Cnty. Hosp. Dist. v. Brown*, 965 S.W. 2d 501 (Tex. 1998) (Employer's oral assurances do not modify at-will employment.)

other basis protected by law, or in retaliation for the exercise of certain protected legal rights.'" *Id.* After describing the hand book in this way, Gonzalez reasserts in the same paragraph that he was fired in violation of his First Amendment rights. *See id.* Thus, Gonzalez alleges that the quoted language contains an implied promise not to terminate an employee in violation of the employee's First Amendment rights.

Texas law "presum[es] that employment is at-will, unless that relationship has been expressly altered by contract or by express rules or policies limiting the conditions under which an employee may be terminated." *Gentilello,* 627 F.3d at 544. (quoting *Muncy v. City of Dallas,* 335 F.3d 394, 398 (5th Cir. 2003)). "Although [Texas] courts usually find that general statements about working conditions, disciplinary procedures, or termination rights are not sufficient to change the at-will employment relationship, a handbook may modify the at-will relationship if it specifically and expressly curtails the employer's right to terminate the employee." *Ehrhardt v. Elec. & Instrumentation Unlimited of La.,* 220 F. Supp. 2d 649, 655 (E.D. Tex. 2002) (citing *Figueroa v. West,* 902 S.W.2d 701, 704 (Tex. App. – El Paso 1995, no writ) and *McAlister v. Medina Elec. Coop., Inc..,* 830 S.W.2d 659, 664 (Tex. App. – San Antonio 1992, writ denied)). However, for an employee handbook to curtail an employer's right to terminate an employee, "it must restrict the at-will relationship in a meaningful and special way and contain a specific contractual term altering the at-will status." *Id.* (citing *Figueroa* 902 S.W.2d at 704.).

Gonzalez has not alleged in his First Amended Complaint that the District's 2012–13 handbook contained a specific contractual term altering his at-will status. An employee handbook may acknowledge that an employee can be dismissed for cause and even provide a non-exhaustive list of examples of grounds for dismissal, but, as the Texas Supreme Court has held, "a statement that an employee may be dismissed for cause is not a specific agreement that an employee may be dismissed only for cause" altering the at-will relationship. *Matagorda County Hosp. Dist. v. Burwell,* 189 S.W.3d 738, 740 (Tex. 2006); *see also Evans v. City of Dallas,* 861 F.2d

846, 849–50 (5th Cir.1988) (analyzing employee handbook as a whole to hold that "when discharging probationary employees . . . valid reasons must exist for such discharge or reduction, and the employee must be advised of these reasons" did not create property interest by altering at-will status); *Cote v. Rivera*, 894 S.W.2d 536, 541 (Tex. App. 1995) (holding handbook listing grounds for dismissal for cause non-exhaustively did not alter at-will relationship). That holding flows from the general rule that "'the employer must unequivocally indicate a definite intent to be bound not to terminate the employee except under clearly specified circumstances' for the at-will relationship to be altered." *Burwell*, 189 S.W.3d at 741 (quoting *Brown*, 965 S.W.2d at 502). Seen in the light most favorable to him, the language Gonzalez excerpts from the District's 2012–13 employee handbook falls short of an unequivocal declaration of the District's intent to be bound not to terminate an employee except in the circumstances specified. *See id.* As Gonzalez concedes, the excerpted handbook language constitutes an acknowledgement of generally-applicable legal restrictions on an employer's power to terminate an employee. *See* Dkt. No. 8 ¶ 38. Written as it is in the passive voice, the sentence quoted by Gonzalez equivocates as to the District's commitments, making the District neither its subject nor its object. *See id.* ("It is unlawful . . . ."). Just as a handbook may acknowledge that an employee can be fired for specific reasons without promising to terminate the employee in only those circumstances in Texas, so too may an employer acknowledge generally-applicable legal rules without altering the at-will relationship. *See Burwell*, 189 S.W.3d at 740–41. As Gonzalez sets forth no more factual material about the employee handbook, *see* 1st Am. Compl. ¶ 38, he has failed to plead sufficient factual material to raise the inference that he had a protected property interest in continued employment above the speculative level. *Compare Burwell,* 189 S.W.3d at 739–40 (holding handbook enumerating reasons for which the employee may be fired did not alter at-will relationship); *Cote*, 895 S.W.2d at 241 (holding handbook rules specifying grievance procedures in detail did not alter at-will status "because the handbook did not contain an express agreement and provided only general guidelines for termination"); *Figueroa*, 902 S.W.2d at 705

(holding handbook did not alter at-will status because handbook "merely reduce[d] [employer's] employment policies to writing for the benefit and convenience of employees . . . and obligated it to do very little."); *McAlister*, 830 S.W.2d at 664 (holding handbook did not alter at-will relationship because it "state[d] several reasons for dismissal, but it [did] not say these are the exclusive reasons or qualify the employer's common-law right to terminate an employee at will"); *with Schaper v. City of Huntsville*, 813 F.2d 709, 713–14 (5th Cir.1987) (citation omitted) (holding city policy that employees could be fired "only for just cause" created property interest under Due Process Clause); *Vida v. El Paso Emp. Fed. Credit Union*, 885 S.W.2d 180, 181 (alteration in original) (holding handbook provision that "[n]o employee shall be penalized for using the grievance procedure." Altered at-will status as to that particular term); *cf.* also *Moss v. Martin*, 473 F.3d 694, 701–02 (7th Cir. 2007) (applying similar presumption of at-will status under Illinois law to hold that "provisions that state that 'the rights of department employees to voluntarily engage in political activities and to make contributions must be recognized and respected' and that "nothing should be done to abridge the constitutional right of any employee to participate in the political process" do not conflict with the Manual's disclaimer or otherwise create an ambiguity that overcomes Illinois' at-will presumption").

2. Liberty Interest

Interpreting the Due Process Clause, the Supreme Court has declared that, "where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Hughes v. City of Garland*, 204 F.3d 223, 226 (5th Cir. 2000) (Quoting *Bd. of Regents Of State Coll. v. Roth*, 408 U.S. 564, 573 (1972)). Consequently, "[a] public employee has a liberty interest protected by the Fourteenth Amendment if she can demonstrate that her employer, in connection with her discharge from public employment, made a statement or charge that 'might seriously damage [her] standing and associations in [her] community' or that 'imposed on [her] a stigma or

other disability that foreclose[s] [her] freedom to take advantage of other employment opportunities.'" *Harris v. City of Balch Springs*, 9 F.Supp.3d 690, 699 (N.D. Tex. 2014) (alterations in original) (quoting *Roth*, 408 U.S. at 573). Thus, when a government employer such as a School District fires an employee, "[a] liberty interest is infringed, and the right to notice and an opportunity to clear one's name arises, only when the employee is 'discharged in a manner that creates a false and defamatory impression about him and thus stigmatizes him and forecloses him from other employment opportunities.'" *Bledsoe v. City of Horn Lake, Miss.*, 449 F.3d 650, 653 (5th Cir. 2006) (quoting *White v. Thomas*, 660 F.2d 680, 684 (5th Cir.1981)); *see* also generally *Hughes*, 204 F.3d at 225–26 (tracing origin and rationale of this doctrine). The discharged public employee's liberty interest, when extant, entitles him "merely [to] a hearing providing a public forum or opportunity to clear one's name, not actual review of the decision to discharge the employee." *Rosenstein v. City of Dallas*, 876 F.2d 392, 395 (5th Cir.1989) (citation omitted), *aff'd in relevant part en banc* 901 F.2d 61 (5th Cir. 1990). To state a claim that the District impinged upon a protected liberty interest by denying Gonzalez an opportunity to clear his name, he must adequately allege the seven factors required by the Fifth Circuit: "(1) he was discharged; (2) stigmatizing charges were made against him in connection with the discharge; (3) the charges were false; (4) he was not provided notice or an opportunity to be heard prior to the discharge; (5) the charges were made public; (6) he requested a hearing to clear his name; and (7) the employer denied the request." *Bledsoe*, 449 F.3d at 653 (citing *Hughes*, 224 F.3d at 226); *Harris*, 9 F. Supp. 3d at 699–700 (quoting *Bledsoe*, 449 f.3d at 653).

Nowhere in his amended complaint does Gonzalez allege that he requested a name-clearing hearing before being fired on September 21, 2012, or in the grievance proceedings which followed. Instead, the amended complaint recites that Gonzalez answered written questions after being suspended with pay on September 6, 2012. Dkt. No. 8 ¶ 35. Gonzalez chronicles the ensuing investigation and names other individuals from whom statements were taken. *See id.* ¶¶ 33, 34, 36. He never,

however, alleges that he asked for a public hearing to clear his name. *See id.*; see also *In re Selcraig*, 705 F.2d 789, 797–98 (5th Cir. 1983) (requiring clarification for whether plaintiff requested name-clearing hearing before allowing discovery on other elements of test for existence of public employee's liberty interest); *Harris*, 9 f. Supp. 3d at 699 (holding complaint stated claim that plaintiff requested name-clearing hearing based on allegation in complaint that "Plaintiff requested during at least two City Council meetings to have an opportunity to clear her name"). According to the amended complaint, Gonzalez raised certain objections at various stages of the grievance process and asked that the District record his Level IV hearing before the board, Dkt. No. 8 ¶¶ 40—55, but nowhere does he allege that he "ask[ed] to confront the Board in a public forum regarding the stigmatizing charges against him either before or after his separation from employment." *Bledsoe*, 449 F.3d at 653–54 (holding plaintiff had no liberty interest in name-clearing hearing for this reason). Nor does Gonzalez allege in even a conclusory manner that the grievance procedure which he utilized leads inexorably to a public hearing so as to make his grievance request in effect a request for a name-clearing hearing. *See id.* at 654 (distinguishing *Rosenstein*, 876 F.2d at 396, because plaintiff's request to use police department's appeals process in that case "would provide the officer with 'a public forum to clear his name before the governing body that discharged him'" but Bledsoe's requests to record and postpone hearing would not provide such a public forum). Drawing the inference in Gonzalez's favor that his hearing before the board was closed to the public and not recorded does not aid him because "recording the meeting would not transform it into a public forum in which [Gonzalez] could contest the charges against him." *Id.* (rejecting argument that request to record closed-door hearing was request for public name-clearing hearing). The Court concludes, therefore, that Gonzalez's amended complaint fails to state a claim that he requested a name-clearing hearing, obviating the need to consider whether he has adequately pleaded that the charges were false and the District publicized the charges against him. *See id.* at 653 (not reaching other factors of seven-factor test because plaintiff did not request name-clearing hearing); *Hughes*, 204 F.3d at 226–

27 (resolving case on fifth element and stating "only if [plaintiff] prevailed on that element would we reach elements (6) and (7)").

### b. Vicarious Liability

"[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (citation omitted). As such, "municipal liability under Section 1983 'requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom.'" *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 866 (5th Cir. 2012) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)). This test, first established in *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), "exists to prevent a collapse of the municipal liability inquiry into a respondeat superior analysis. A municipality may not be subject to liability merely for employing a tortfeasor." *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 167 (5th Cir. 2010) (citing *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 415 (1997) and *City of Canton, Ohio v. Harris*, 489 U.S. 378, 392 (1989)). In contrast, vicarious liability under Section 1983 requires "deliberate action attributable to the municipality that is the direct cause of the alleged constitutional violation." *Id.* (citing *Harris*, 489 U.S. at 319-92).

In his amended complaint, Gonzalez states that the District's "Board, the policy makers, made the most recent and ultimate decision that adversely affected Plaintiff." Dkt. No. 8 ¶ 67. He then quotes the Supreme Court's decision in *St. Louis v. Praprotnik*, 485 US 112 (1988): "[W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their

ratification would be chargeable to the municipality because their decision is final." *Id.* (quoting *Praprotnik*, 485 US. at 127). The Fifth Circuit has repeatedly "held that the board of trustees of an independent school district in Texas is a policymaker for purposes of § 1983 cases in which the board reviewed employment decisions made by subordinates." *Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 220 (5th Cir.) (citing *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 215 (5th Cir.1998) and *Jett v. Dallas Indep. Sch. Dist.*, 7 F.3d 1241, 1245 (5th Cir. 1993)); *see also* TEX. EDUC. CODE § 11.151(b) (Vernon's Texas Statutes and Codes Annotated) ("The trustees as a body corporate have the exclusive power and duty to govern and oversee the management of the public schools of the district.").

In its motion to dismiss, the District acknowledges that Gonzalez's amended complaint states a claim that the Board ratified the decision to fire him. *See* Dkt. No. 10 at 11 (emphasis added) ("*Other than his termination claim*, Plaintiff has not pleaded any action by the Board of Trustees that violated his First Amendment or due process rights."). It argues, however, that Gonzalez has not alleged that an official policy of the District was the moving force for (1) T. Gonzalez's directive to him to remove his Facebook posting on the Huffington Post's page and privatize his account or (2) the decision made September 6, 2012, to place him on administrative leave. *See id.*; *see also* 1st Am. Compl. ¶¶ 58, 59 (enumerating these two as separate acts which allegedly violated Gonzalez's First Amendment rights).

Gonzalez's amended complaint does not state a claim that the District's Board adopted the take-down directive or Gonzalez's suspension as District policy through ratification. In a case in which the undisputed evidence showed that a Texas school district superintendent never made the board aware of his political motives for terminating an employee and plaintiff never aired that grievance before the board, the Fifth Circuit held that the board's ratification of the superintendent's termination decision did not subject the district to § 1983 liability. *Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 603–04 (5th Cir. 2001) (holding that, "[i]f there is no evidence that the board knew of the protected activity, [the plaintiff]

14

cannot show that the activity motivated retaliatory behavior"). Gonzalez does not point to any portion of his amended complaint alleging that he challenged T. Gonzalez's take-down directive or his suspension before the District's board. *See* Resp. to M. to Dismiss 7, Dkt. No. 12; *see also* 1st Am. Compl. ¶¶ 40–55 (describing grievance process and setting forth objections to process without mentioning take-down directive or suspension). Gonzalez alleges that T. Gonzalez told him to see George Banda (Banda), a "computer tech," after she directed him to remove the Facebook post and privatize his account. 1st Am. Compl. ¶ 15. Banda gave a written statement during the investigation preceding Gonzalez's termination. *See id.* ¶ 36. Drawing the reasonable inference that the District's board had this statement before it at the Level IV grievance proceeding, Banda's statements, as described by Gonzalez in his amended complaint, concern Pettiford's comments and responses posted on the school's Facebook page. *See id.* ¶ 36 ("According to [Banda], Mr. Pettiford posted several comments about the original post onto the school's Facebook page. One person (Williams) commented to Mr. Pettiford's post something to the effect that 'this is appalling.'"). Thus, those statements did not make the Board aware of T. Gonzalez's take-down directive. *See id.* Accordingly, Gonzalez's amended complaint does not state a claim that the Board had actual knowledge of any decision other than the decision to fire Gonzalez for the comment he posted on the Huffington Post's Facebook page. *See Beattie*, 254 F.3d at 603–04; *Okon v. Harris Cnty. Hosp. Dist.*, 426 F. Appx. 312, 317–18 (5th Cir. 2011) (per curiam, unpublished) (denying § 1983 municipal liability because plaintiff did not "show[] that the Board had actual or constructive knowledge of and approved any alleged racial animus underlying the decision to terminate her" as part of reduction-in-force plan approved by board).

Gonzalez, however, maintains that his amended complaint states a claim that the District's board delegated to Flores, the District's superintendent, final policymaking authority over the dismissal of at-will employees. In his response to the pending motion to dismiss, Gonzalez asserts that "the District had a policy in

place that gave the Superintendent final authority to hire and dismiss non-contractual employees on an at-will basis as long it was not in violation of Local policy DCD." Dkt. No. 12 at 6. Similarly, in his amended complaint Gonzalez pleads that policy DCD constrained Flores's power to fire at-will employees. Dkt. No. 8 ¶ 39 (alleging that policy DCD gave Flores "authority to hire and fire non-contractual employees"). These allegations preclude Flores from being a final policymaker because "[a]n official whose discretionary decisions on a particular matter are final and unreviewable, meaning they can't be overturned, is constrained if another entity has ultimate power to guide that discretion, at least prescriptively, whether or not that power is exercised." An official so constrained is not a final policymaker. *Bolton v. City of Dallas, Tex.*, 541 F.3d 545, 551 (5th Cir. 2008) (alteration in original) (quoting *Barrow v. Greenville Indep. Sch. Dist.*, 480 F.3d 377, 382 (5th Cir. 2007)) (holding city manager who fired plaintiff for reason allegedly violative of city charter not final policymaker because charter declared city policy and limited his discretion); *see* also *Praprotnik*, 485 U.S. at 127 ("When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality."); *Barrow*, 480 F.3d at 380–81 (discussing holding of *Jett, supra*, 7 F.3d 1241 (5th Cir. 1993) that superintendent was not policymaker because "the superintendent's power to decide transfers was entirely delegated by the board, hence the board had authority to modify or eliminate that power, rendering it the policymaker"). Retained authority notwithstanding, "[a]bsent a contrary regulation or ordinance, a city council's or city manager's continuous refusal to exercise some theoretical authority to review a municipal official's policy decisions will, at some point, establish the municipal official as the final policymaking authority by custom or usage having the force of state law." *Gros v. City of Grand Prairie*, 181 F.3d 613, 616 (5th Cir. 1999). However, Gonzalez mentions no other incidents of alleged review of Flores's decisions by the District's board in his amended complaint as would be required to show a custom or usage which can be characterized as continuous. *See id.*; *Young v. City of Clear Lake Shores*, No. G-10-226, 2010 WL

16

4102956, at *1 (S.D. Tex. Oct. 18, 2010) (denying Rule 12(b)(6) motion where complaint alleged both that city delegated authority to police chief and police chief "committed similar conduct in the past which may be under investigation by state authorities."). Because the amended complaint does not attempt to set out any other incident of alleged retaliation on the part of Flores or any other District official, Gonzalez has not pleaded a "custom or usage of which the [District] board must have been aware." *Jett*, 7 F.3d at 1251.

Finally, Gonzalez quotes *Young*, *supra*, in his response. Resp. to M. to Dismiss 7. That case mentions the "cat's paw" or rubber-stamp theory. *See Young*, 2010 WL 4102956, at *1. In unreported cases, the Fifth Circuit has twice declined to rule on how, if at all, the Supreme Court's decision in *Staub v. Proctor Hospital*, 562 U.S. 411 (2011) affects this theory in § 1983 cases. *See Okon*, 426 F. Appx. at 319 (citing *Brown v. N. Panola Sch. Dist.*, 420 F. Appx. 399, 400, (5th Cir. 2011)) (expressly declining to reach "cat's paw liability in light of *Staub*."). Before *Staub* was decided, the Fifth Circuit stated that, to invoke this exception, a First Amendment plaintiff in a speech-retaliation case must show: "(1) that a co-worker exhibited [retaliatory] animus, and (2) that the same co-worker 'possessed leverage, or exerted influence, over the titular decisionmaker.'" *Depree v. Sanders*, 588 F.3d 282, 288 (5th Cir. 2009) (citing *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004)) (applying rule to plaintiff who claimed he was terminated in retaliation for protected speech); *see also Beattie*, 254 F.3d at 604 n.14 ("If an employee can demonstrate that the subordinate's evaluation was tainted by an illegal intent and that it had sufficient influence or leverage over the ultimate decisionmaker, the motives of the subordinate become relevant."). Despite his quotation, Gonzalez's response presses the distinct argument, rejected in the previous paragraph, that the District's board completely delegated authority to Flores i.e., that authority flowed downward from the board. *See* Resp. to M. to Dismiss 7. Accordingly, the Court expresses no view on the rubber-stamp theory and how, if at all, it applies in § 1983 cases in the wake of *Staub*. *See Okon*, 426 F. Appx. at 319.

17

### c. Conspiracy

The District also challenges Gonzalez's § 1983 conspiracy claim as pleaded in his amended complaint. Section 1983 does not authorize a plaintiff to sue based on "a conspiracy by itself." *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Circuit 1990). Instead, a § 1983 conspiracy claim serves "as the legal mechanism through which to impose liability on each and all of the Defendants without regard to the person doing the particular act." *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995) (quoting *Pfannstiel*, 918 F.2d at 1187). To state a conspiracy claim under § 1983, a plaintiff must allege: "(1) 'an agreement between private and public defendants to commit an illegal act,' and (2) 'an actual deprivation of constitutional rights.'" *Jones v. Tyson Foods, Inc.*, 971 F. Supp. 2d 632, 646 (N.D. Miss. 2013) (quoting *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994)).

Gonzalez's amended complaint does not state a claim of an agreement vicariously attributable to the District to participate in the alleged conspiracy. Gonzalez alleges that Pettiford and Hollis conspired to have him fired. 1st Am. Compl. ¶¶ 62, 63. He further pleads that Pettiford's conversations with District officials on September 6, 2012, resulted in the District joining the conspiracy "[h]owever tacit or implicit" that agreement was. *Id.* ¶ 63. The District argues that these allegations are too speculative to plead the existence of an agreement among these three parties and that, in any event, Gonzalez does not assert that Flores or a board member spoke with Pettiford in order to make joining the alleged conspiracy an act attributable to the District. *See* M. to Dismiss 5–6, Dkt. No. 10. Plaintiff does not dispute the latter contention in his response. *See* Dkt. No. 12 at 15–17. Indeed, the amended complaint states that Pettiford spoke with Robert Shane Strubhart (Strubhart) on September 6, 2012, when the District allegedly joined the conspiracy. *See* Dkt. No. 8 ¶¶ 22, 62.

Although a final policymaker's agreement to join a conspiracy may subject a school district to vicarious liability under § 1983, *Monell* prevents the District from being held liable where "the sole nexus between the employer and the tort is the fact of the employer-employee relationship." *Turner v. Upton Cnty., Tex.*, 915 F.2d 133, 138 (5th Cir. 1990). The Fifth Circuit has taken pains to "carefully distinguish" these two situations. *Id.* (stressing that county sheriff was final policymaker as to alleged conduct and holding that § 1983 municipal vicarious liability can attach "[w]hen the official representing the ultimate repository of law enforcement power in the county makes a deliberate decision to abuse that power to the detriment of its citizens."). Assuming without deciding that Gonzalez adequately alleges that Strubhart agreed to join an existing conspiracy between Pettiford and Hollis on September 6, 2012, Gonzalez's amended complaint, even when viewed in the light most favorable to him, permits only the inference that Strubhart was a District employee at that time. *See* Dkt. No. 8 ¶ 22. Gonzalez does not allege or argue that Strubhart was a policymaker for the District. *See id.*; *see* also Resp. to M. to Dismiss 16 (arguing only that inference of agreement is plausible). Consequently, Gonzalez fails to allege a plausible claim subjecting the District vicariously to liability for joining the alleged conspiracy between Pettiford and Hollis. *See Turner*, 915 F.2d at 137–38; *Cooper v. City of Plano*, No. 4:10-CV-689, 2011 WL 4344303, at *5 (E.D. Tex., Aug. 19, 2011) (granting Rule 12(b)(6) motion where plaintiff "failed to allege whatsoever that any particular Defendant or the City's policymaker were participants in an illegal agreement").

IV.  CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the District's Second 12(b)(6) Motion to Dismiss for Failure to State a Claim upon which Relief can be Granted.  The Court **DISMISSES** Gonzalez's claim under the Due Process Clause, Dkt. No. 8 ¶ 71; his conspiracy claim, *id.* ¶¶ 62–66; and his First Amendment claims arising out of the alleged directive to remove a Facebook post on August 31, 2012, and his suspension on September 6, 2012, *id.* ¶¶ 56–60. It is so ORDERED.

SIGNED this ___7___ day of March, 2015.

*/s/ Hilda Tagle*

Hilda G. Tagle
Senior United States District Judge